# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MID-HUDSON ANESTHESIOLOGISTS, P.C.   )<br>    361 Broadway   )<br>    Newburgh, New York 12550   )<br>      )<br>         Plaintiff,   )<br>      )<br>    v.   )<br>      )<br>ST. LUKE'S CORNWALL HOSPITAL n/k/a   )<br>MONTEFIORE ST. LUKE'S CORNWALL,   )<br>    70 Dubois Street   )<br>    Newburgh, New York 12550   )<br>      )<br>MONTEFIORE HEALTH SYSTEM, INC,   )<br>    555 South Broadway   )<br>    Tarrytown, New York 10591   )<br>      )<br>MONTEFIORE MEDICAL CENTER,   )<br>    111 East 210th Street   )<br>    Bronx, New York 10467   )<br>      )<br>         Defendants.   )<br>      ) | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>_____CV_____<br><br># 24 CV 04740 |

Plaintiff, MID-HUDSON ANESTHESIOLOGISTS, PC, by and through its attorneys, Daniels Porco & Lusardi, LLP complaining of the Defendants, ST. LUKE'S CORNWALL HOSPITAL n/k/a MONTEFIORE ST. LUKE'S CORNWALL, MONTEFIORE HEALTH SYSTEM, INC., and MONTEFIORE MEDICAL CENTER (collectively "Defendants"), alleges and shows as follows:

## PARTIES

1.      Plaintiff Mid-Hudson Anesthesiologists, P.C. (hereinafter "Plaintiff" or "MHA") is a medical group established as a New York professional corporation in the year 1975.

2.      Defendant St. Luke's Cornwall Hospital (hereinafter "SLCH") was, at all times mentioned, a not-for-profit hospital corporation organized under the laws of the State of New York, providing hospital services in the State of New York.

3.      Defendant Montefiore Health System, Inc. ("Montefiore") was, at all times mentioned herein, a not-for-profit hospital corporation organized under the laws of the State of New York, providing hospital services in the State of New York.

4.      Montefiore, according to its 2021 Form 990 Return of Organization Exempt from Income Tax, filed with the Internal Revenue Service ("990") was the "parent or indirect parent corporation, operating in furtherance and support of...St. Luke's Cornwall Health System."

5.      On its 990, Montefiore identified that a majority of its Trustees "comprised a majority of the Directors or Trustees of...supported organizations...and there was common supervision or control by the persons supervising or controlling both the supporting organization and the supported organizations." Therefore, Montefiore, for all intents and purposes, controlled the actions of SLCH with regard to major decisions, such as exclusive provider contracts.

6.      Defendant Montefiore Medical Center ("MMC") was, at all times mentioned herein, a not-for-Profit hospital corporation organized under the laws of the State of New York, providing hospital services in the State of New York.

7.      Defendants SLCH, Montefiore, and MMC (collectively "Hospital Defendants" or "Defendants") all participated in interstate commerce and their transactions with Plaintiff MHA had a significant effect on interstate commerce.

8.      Hospital Defendants and Plaintiff treated patients who traveled in interstate commerce, administered and prescribed drugs and anesthesia supplies

2

manufactured out of state, and were paid by out-of-state, third-party insurers and payers.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's cause of action for violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, for misappropriation of trade secrets, relates to products and services used in or intended for use in interstate or foreign commerce, and arises under the laws of the United States.

10.   This Court also has subject matter jurisdiction over the state law claims under 28 U.S.C. § 1367, because those claims are so related to the federal claims that they form part of the same case or controversy.

11.   This Court has personal jurisdiction because all Defendants reside within New York State, and specifically within the counties of Bronx County, New York; Dutchess County, New York; and Orange County, New York.

12.   Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, as well as pursuant to 28 U.S.C. § 1391(b), (c), and (d), because during the relevant periods all of the Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein was carried out in this District.

## FACTS COMMON TO ALL CLAIMS

13.   Defendants violated their Professional Services Agreement and their Confidentiality and Nondisclosure Agreement with Plaintiff MHA in furtherance of a scheme to force MHA to ███████ so that Defendants could poach MHA's physicians

and bring them ████████ in an employed physician model that destroyed MHA's value as a Professional Corporation.

14.     MHA and SLCH entered into an Anesthesia Services Agreement ("Agreement" or "PSA") dated August 27, 2003, which was subsequently amended, but remained in effect through September 30, 2021.

15.     MHA was the exclusive provider of anesthesia services for SLCH and the ambulatory surgery center, East Orange Ambulatory Surgery Center, in which SLCH had ████████████████████████

16.     Pursuant to MHA's PSA with SLHC, it was restricted from providing anesthesia services to any other entities.

17.     Specifically, Section 3.2.6 of the Agreement stated that:

> "3.2.6. <u>Outside Activities</u>. During the term hereof, the P.C. and its shareholders, as well as the Director, P.C. Physicians, any physicians employed or otherwise under contract to provide services by any of the foregoing, and any entity or organization owned or controlled by any of them (collectively, the "Restricted Parties") shall be prohibited from, directly or indirectly, engaging in or contracting for the provision of any medical services that negatively impact coverage for medical services provided at the Hospital, including the type of service provided as Anesthesiology and Pain Management hereunder, to any third party within a twenty (20) mile radius of any campus of the Hospital. Whenever the Hospital participates in a joint venture requiring the services of anesthesiology, hospital shall recommend, support, and where appropriate, vote in favor of said joint venture entering into good faith negotiations with P.C. for the provision of said services..."

18.     The term of the Agreement, pursuant to Section 6.1, was for a term of three (3) years, "subject, however, to Sections 6.2 and 6.3."

19.     Section 6.2 required "best efforts" to negotiate contract extensions prior to termination of the Agreement.  Specifically, it stated:

"6.2 Periodic Review: Beginning with the ninetieth (90th) day prior to the end of the initial Term of the Agreement or any renewal term thereof, this Agreement shall be subject to review at the request of either party hereto. During this review period the parties agree to use their best efforts to meet together at mutually agreeable times for the review and, if necessary, renegotiation of one or more of the terms hereof, including compensation..."

20. The SLCH and MHA Agreement, pursuant to its most recent amendments and renewals, was set to expire on September 30, 2021.

21. Accordingly, the ninety (90) day periodic review ("Review Period") was to begin on July 2, 2021.

22. During the COVID-19 pandemic year of 2020, both SLCH and MHA were under financial pressure due to the temporary cancellation of elective surgeries as a precautionary measure.

23. As SLCH was dependent upon elective surgeries for an extensive share of its revenue, and as SLCH would be unable to resume this revenue stream if MHA was not financially viable and able to provide anesthesia services once pandemic restrictions were lifted, SLCH strategically decided to share revenue with MHA during the pandemic.

24. This sharing of revenue, which was to the financial benefit of SLCH's medium-term and long-term operations, was facilitated by a Confidentiality and Nondisclosure Agreement ("Confidentiality Agreement) entered into between SLCH and MHA on February 19, 2020, which included, among other things, the non-solicitation provision found in Section 4 of the Confidentiality Agreement which plainly stated that:

"Each party hereby agrees that during the term of the PSA [Agreement] and for a period of Three Hundred Sixty Five (365) days immediately following termination or expiration of the PSA, neither Party nor any of its Affiliates shall, on its behalf or on behalf of any individual or entity, hire, attempt to hire, or induce or attempt to

5

> induce any individual who is, or was at any time, an employee or
> independent contractor of the other Party to terminate such
> employee's employment or engagement, as the case may be, with such
> other party."

25.     Presumably, to ensure the effective operation of the revenue sharing,

SLCH asked MHA to share sensitive financial information with it, that was protected by

the strictures of the Confidentiality Agreement.

26.     MHA had confidence that it could share this information, without fear of

its being used against it at some later time, due to the terms of the Confidentiality

Agreement itself.

27.     According to the Confidentiality Agreement, Section 2(A) "Confidential

and Proprietary Information may be used by the receiving party only for the Purpose".

The term "Purpose" was defined in the third WHEREAS clause to the Confidentiality

Agreement as follow:

> "the Parties contemplate they may each disclose certain information
> to the other on a confidential basis for the purpose of discussions that
> may lead to a business engagement, transaction, or other definitive
> relationship between the Parties and/or affiliated persons, the specific
> nature of which is presently undefined ("Purpose")."

28.     SLCH, however, during the midst of the pandemic, used MHA's

confidence and trust in it to misappropriate its financial data to its own benefit and

MHA's detriment.

29.     On November 4, 2020, ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████

30. MHA, acting in good faith, supplied this information.

31. CMO Del Savio then turned around and used this data to urge SLCH Chief Executive Officer Joan Cusack-McGuirk ("CEO Cusack-McGuirk") ███████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████

32. However, more incriminating than the misappropriation of confidential data to further the ███████ scheme was the acknowledgement that ██████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

33. Envision was at all times relevant to this proceeding an anesthesiology group medical practice that competed with MHA.

34. CMO Del Savio's ██████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████

35. This abandonment was despite the fact that the PSA mandated Review Period was not to start until July 2, 2021, and that during this period "best efforts" at renegotiation were required.

36. Rather than employ "best efforts" to maintain their relationship with MHA, Defendants employed rapacious efforts to destroy MHA relying upon misappropriated financial data obtained under false pretenses.

37. In the same November 25, 2020 ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████

38.     Plainly, using the confidential information to perform financial analyses prior to the Review Period to contravene the underlying Agreement's requirement of "best efforts" negotiations is not in keeping with the Purpose, as defined in the Confidentiality Agreement. Thus, Defendants misappropriated this financial data directly for their own plans of forcing MHA to ███████ so that they could acquire its employed physicians, who had restrictive covenants, for an in-house staffing scheme.

39.     In or about May and June of 2021, while under contract with MHA and without invoking the Review Period, SLCH nearly completed surreptitious negotiations with MHA's competitor, Envision.  The intent was to replace MHA with Envision without giving MHA the chance to renegotiate its existing Agreement with SLCH— plainly violating the "best efforts" requirement of the PSA.

40.     On June 14, 2021, with SLCH's negotiations with Envision having almost come to fruition, MHA's physician leadership, Dr. Kal Shukla ("Dr. Shukla") and Dr. Russell Marwin ("Dr. Marwin") (collectively "MHA Physician Leadership"), was summoned by CEO Del Salvio and told that they must join the Envision group as individual employees or face professional obliteration in the market in which they practiced.

41.     Of utmost importance, the PSA had its own restrictive covenant against MHA.  It provided not only that MHA could not compete in the SLCH market during the term of the PSA, the only market in which MHA operated, but also that during that term, it was "prohibited from, directly or indirectly *engaging in or contracting for* the provision of any medical services that negatively impact coverage for medical services provided at the Hospital, including the type of service provided as

Anesthesiology and Pain Management hereunder, to any third party within a twenty (20) mile radius of any campus of the Hospital."

42.     The disjunctive use of the terms "engaging" and "contracting" made clear that these were two separate activities.

43.     Accordingly, while MHA reasonably could not perform anesthesia and pain management services for another entity during the term of the contract, it also could not even "contract" for the provision of such services. This bar was not only for negotiations for concurrent services, but also for prospective services, as otherwise there would be no substantive difference between "engaging" and "contracting" and to read the contract in this manner would render its language superfluous.

44.     The negative impact to SLCH spoken of in the restrictive covenant, would occur regardless of MHA's termination of services to SLCH, because MHA's termination of services was completely and wholly premised on the idea that MHA's employed physicians would become employed physicians of SLCH, or some such other Montefiore affiliate or subsidiary. Therefore, the bar to negotiation of prospective services with other healthcare suppliers was not negated by the contemplated end of the PSA.

45.     In an ███████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████

████████████████████

46.     No medical practice could survive the raiding of its physicians, such that two-thirds of them were pulled out of the practice in the span of two months.

47.     Therefore, as sophisticated actors in the healthcare space, Defendants knew that they were functionally destroying MHA, rendering it noncompetitive for any alternative contracts, and depleting it of virtually all of its equity by draining its human capital.

48.     Thus, because of the restrictive covenant's bar to "contracting" in a direct or indirect manner prior to October 1, 2021, MHA was not free to simply shop its services to other medical providers in the Mid-Hudson Valley. By way of example only, had MHA wished to negotiate with hospitals in Poughkeepsie, New York, such as Vassar Brothers Medical Center (17.7 miles from SLCH), it would have found itself within the twenty (20) mile exclusion zone, and thus could not even enter into a contract for future services to occur after the September 30, 2020 termination of its contract.

49.     This geographic restriction extended as far south and east as Westchester County, New York, covering even New York-Presbyterian Hudson Valley Hospital in Cortlandt Manor, New York (15.44 miles) and as far west as Garrett Health Medical Center, in Middletown, New York (18.87 miles).

50.     Moreover, MHA was also hemmed in by the geographic restriction as far north and west as Health Quest Hospital, in New Paltz, New York (16.83 miles).

51.     It was these geographic restrictions that gave great necessity to the "best efforts" clause in the PSA and the Review Period spelled out in Section 6.2 of the Agreement. Without these provisions, purporting to give MHA some measure of security

in its ongoing relationship with SLCH, MHA ran a severe risk of being eviscerated by any aggressive actions on the part of SLCH.

52.     Even though it would have been theoretically "free" to negotiate with other medical providers and then contracted with them after the expiration of the PSA, by then it would be functionally too late to save the group medical practice, as it would be left, at best, for a period of months with no revenue and its physicians would have already scattered under fear of income loss.

53.     In mid-June of 2021, negotiations between SLCH and Envision were abruptly cancelled by SLCH. ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████.

54.     Instead, SLCH adopted an ███████ model to contract with Montefiore Medical Center's Faculty Practice Group ("FPG") to provide anesthesia services, thereby foreclosing MHA from the only reasonable corporate opportunity that the Agreement afforded it. However, Defendants' vision was not that FPG would come in and replace MHA physicians with FPG physicians, rather it was that MHA physicians would be poached and would become FPG physicians.

55.     In accord with its violation of the PSA and in alignment with its vision of successfully soliciting the vast bulk of MHA's physicians; almost two (2) weeks before the Review Period was even to commence, Montefiore and SLCH were already contemplating that MHA would "disband" due to the Defendants' unilateral actions.

This was expressed in a June 23, 2021 ███████████████████████████
███████

56.     In this email, Felder stated the following:



57.     It would have been news to MHA that the group would ████████, since at that time MHA was actively pursuing opportunities to continue to provide services.

58.     Such opportunities would ultimately come to include providing services at Northwell Health facilities and/or New York Presbyterian Mid-Hudson Hospital.

59.     With determination, MHA Physician Leadership pursued the putative opportunities, despite the improbability of success of such negotiations, due to the provisions of the PSA's restrictive covenant and the wholesale attempt of SLCH to poach MHA physicians.  When this poaching became known in the medical community, it scared off potential partners of MHA and rendered attempts at collaboration near impossible.

60.     On June 28, 2021, Defendants, ████████████████████████
████████████████████████████████████████████████████████



61.     This CRNA salary and hourly data was confidential, subject to the Confidentiality Agreement.

62.     As June progressed and turned into early July 2021, SLCH found itself unable to accomplish its attempt to dismember MHA, for its own reimbursement-seeking purposes, by pressuring MHA's Physician Leadership into abandoning their equity interest in MHA and becoming mere employees of a vast medical system.

63.     ███████████████████████████████

64.     Foiled, so far, in this anticompetitive endeavor to squeeze insurers for additional reimbursements, which came despite the fact that in 2020 SLCH had revenue of $30,149,725, **underlined**after expenses****, and assets of $234,143,795, SLCH turned towards even greater predatory measures against MHA.

65.     SLCH, having explicitly based the anticipated financial success of the FPG contract on recruiting, in violation of restrictive covenants, the employed physicians of MHA to work for FPG, refused to negotiate with MHA Physician Leadership about an

MHA corporate extension; but they used their extreme leverage against MHA, to attempt to bully its physicians into becoming direct employees of SLCH.

66.    As early as July 6, 2021, SLCH was assessing the ███████ of MHA physicians, while purportedly negotiating an employed model with MHA through its leadership.  This undermines the idea that any holistic negotiations with MHA physicians, through MHA physician leadership, was being done in good faith.

67.    In a July 6, 2021 ████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████

68.    After making its assessment of ███████████████████████ SLCH decided to press ahead with blatant solicitation of MHA physicians and began directly contacting these physicians with offers of employment.

69.    By July 8, 2021, MHA was aware of these efforts.

70.    MHA then took the only responsive action it could.

71.    MHA sought to enforce at least a portion of its legal rights through a Cease and Desist letter, dated July 8, 2021, and transmitted by email no later than July 12, 2021.  In this letter, MHA plainly communicated that MHA physicians had "contractual and/or common law obligations which prevent them from competing with MHA, including, but not limited to, accepting employment with the Hospital and/or the Hospital's affiliates."

72.     At this juncture, SLCH was not only in violation of the PSA and the Confidentiality Agreement, but it was on notice that its actions were attempts to entice MHA physicians to breach their legal obligations to their employer.

73.     Nonetheless, on July 12, 2021, Eikermann, █████████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ███████████

74.     On July 22, 2021, in brazen disregard of the Cease and Desist Letter, Eikermann escalated the process of threatening MHA with the contractually violative direct solicitation of its physicians.  On that day, he stated in an █████████████ ████████████████████████████████████████████████████████ █████████████████████████████████████████████

75.     ████████████████████████████████████" directly in flagrant contravention of their restrictive covenants with MHA and the Confidentiality Agreement between MHA and SLCH.

76.     On July 25, 2021, Eikermann began implementing his threats to decimate MHA through direct solicitation of its physicians, in violation of their known restrictive covenants with MHA.  Eikermann's hope was that by inducing MHA physicians to violate their known legal obligations to their employer, he could recruit MHA physicians—█████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████.

77.     ████████████████████████████████████████████ ████████████████████████████████████████████████████████

15

██████████████████████████████████████████████

████████████████

78.    In an ████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████

79.    In response to this ████████████████████████

██████████████████████████████████████████

██████████████████████████████████.

80.    With these actions, the wheels were set in motion for the irrevocable destruction of MHA.

81.    MHA's employed physicians, knowing now that the MHA contract would not be renewed, occurring as a violation of the "best efforts" clause, and fearful that SLCH's predatory actions would have their intended effect of crushing the practice, began seeking alternate employment to maintain income and support for themselves and their families and to preserve their professional careers.

82.    Because there was indeed great group loyalty; only one MHA employed physician, ████████████ actually responded to SLCH's solicitation and violated his restrictive covenant by performing services for SLCH.

83.    However, the rest of MHA's employed physicians were scattered throughout the Hudson Valley; and its Partner physicians were left to pursue their careers as mere employees, with no equity interest in an ongoing medical practice.

84. MHA was not merely a collection of doctors providing anesthesia services. It was a vehicle for its partner physicians to acquire equity, after decades of serving their community through the provision of vital medical services.

85. This total equity was valued at over five million dollars ($5,000,000.00) at the time of SLCH's obliteration of the practice through contractually violative acts.

86. The fact that a $234,143,795.00 hospital, which is part of the Montefiore Medical System behemoth, stooped to destroy a medical practice with a worth of approximately two percent (2%) of the hospital's value, in its quest for another $2.8 million in reimbursements, through multiple contract violations, is repugnant to any sense of good faith and fair dealing—let alone the "best efforts" that the contract required.

87. SLCH never had any intent of negotiating in good faith with MHA using best efforts pursuant to the PSA during the Review Period.

88. SLCH always intended to use its leverage and power to destroy MHA.

89. SLCH succeeded in its endeavor in eviscerating MHA and eliminating the worth of the MHA practice and the equity of MHA partner physicians.

## COUNT I

### Breach of Contract: Professional Services Agreement
### (Defendant St. Luke's Cornwall Hospital)

90. Plaintiff repeats, realleges, and reiterates the allegations contained in all of the proceeding paragraphs.

91. That the contract between Plaintiff and SLCH, dated August 27, 2003, and amended various times, a copy of which is annexed hereto as **Exhibit A,** was a valid contract between Plaintiff and SLCH.

92.     That the Defendants had knowledge of the aforesaid contract and its requirements for a ninety-day period of review, during which "best efforts" had to be made to negotiate renewal.

93.     That the Defendants flagrantly, maliciously, willfully, and intentionally violated the "best efforts" requirement, found in the Periodic Review paragraph, found at Section 6.2 of the PSA.

94.     That this violation was orchestrated by Defendant Montefiore and Defendant MMC and their personnel, in cooperation and connection with Defendant SLCH.

95.     That as a result of the Defendants' interference with the aforesaid contract between Plaintiff and SLCH, Plaintiff has been damaged as follows: loss of revenue, loss of economic advantage, loss of business relationships, disruption of the group practice, loss of value and equity; and Plaintiff has otherwise been damaged in a sum which cannot presently be determined, but which is at least seven million dollars ($7,000,000.00).

## COUNT II

### Breach of Contract: Confidentiality and Nondisclosure Agreement (Defendant St. Luke's Cornwall Hospital)

96.     Plaintiff repeats, realleges, and reiterates the allegations contained in all of the proceeding paragraphs.

97.     That the contract between Plaintiff and SLCH, dated February 19, 2020, a copy of which is annexed hereto as **Exhibit B**, was a valid contract between Plaintiff and SLCH.

98.     That the Defendants had knowledge of the aforesaid contract and its requirements of confidentiality and non-solicitation.

99.     That the Defendants flagrantly, maliciously, willfully, and intentionally violated Section 2, Obligations: Communication and Use, and Section 4, Non-Solicitation.

100.     That this violation was orchestrated by Defendant Montefiore and Defendant MMC and their personnel, in cooperation and connection with Defendant SLCH.

101.     That as a result of the Defendants' interference with the aforesaid contract between Plaintiff and SLCH, Plaintiff has been damaged as follows: loss of revenue, loss of economic advantage, loss of business relationships, disruption of the group practice, loss of value and equity; and Plaintiff has otherwise been damaged in a sum which cannot presently be determined, but which is at least seven million dollars ($7,000,000).

## **COUNT III**

### **Breach of Covenant of Good Faith and Fair Dealing: Professional Services Agreement**
### **(Defendant St. Luke's Cornwall Hospital)**

102.     Plaintiff repeats, realleges, and reiterates the allegations contained above as if fully set forth herein.

103.     That the Contract between Plaintiff and Defendants, as aforesaid, was in existence since 2003 and had been routinely renewed several times over the course of decades.  Prior to that, the Plaintiff and Defendant maintained a contractual

relationship for the provision of anesthesiology and pain management services for several decades.

104.    That the longstanding business relationship between Plaintiff and Defendant SLCH, was based upon mutual good faith and fair dealing.

105.    That a covenant of good faith and fair dealing was expressly and impliedly provided in the contract between Plaintiff and Defendant SLCH.

106.    That the Defendants breached the covenant of good faith and fair dealing between the parties under the contract and their long-standing business relationship through the conduct hereinabove alleged.  In particular, and without limitation, the Defendants knew that the Plaintiff and its physicians had no business relations at that time other than with Defendant SLCH and its private ambulatory surgery center. The contract between Plaintiff and Defendant prohibited Plaintiff's physicians from seeking employment other than in the service of Defendant SLCH and the ambulatory surgery center.

107.    The Defendants, in bad faith and with intent to place the Plaintiff and its physicians in a circumstance of economic duress whereby Defendants would be better able to accomplish their malicious objectives, as aforesaid, refused to advise the Plaintiff that its contract would not be renewed and would be terminated on September 30, 2021, until on or about June 14, 2021.  The Defendants then refused to negotiate at all with Plaintiff and further refused to consider any extension of the September 30, 2021 termination date of the contract, thereby subjecting the Plaintiff to additional economic duress.

108.    The Defendants did further knowingly, willfully, and maliciously, and without justification, violate the provisions of the restrictive covenants in the

agreements between Plaintiff and its physicians by soliciting Plaintiff's physicians directly to take positions with Defendant SLCH without benefit of the medical group.

109.    That as a result of the Defendants' breach of the covenant of good faith and fair dealing set forth in the parties' longstanding contractual relations, the Plaintiff breached the contract between Plaintiff and Defendant SLCH, and Plaintiff has been damaged as a result thereof as follows: loss of revenue from its physicians and staff; loss of economic advantage, loss of business relationships, attorneys' fees incurred in the enforcement of the aforesaid restrictive covenant and otherwise; disruption of the Plaintiff's group practice; and Plaintiff has otherwise been damaged in a sum which cannot be determined presently, but which is at least seven million dollars ($7,000,000.00).

110.    That Plaintiff is further entitled to punitive damages in the sum of Five Million Dollars ($5,000,000.00).

## COUNT IV

### Inducing Breach of Contract
### (All Defendants)

111.    Plaintiff repeats, realleges, and reiterates all preceding paragraphs as if fully set forth herein.

112.    That the Contract between Plaintiff and ███████████████ dated November 13, 2007, a copy of which is annexed hereto as **Exhibit C**, was a valid contract between Plaintiff and █████████.

113.    That the Defendants had knowledge of the aforesaid contract and the restrictive covenant prohibiting ████████ from practicing pain management medicine within 20 miles of Cornwall, New York, upon termination of said contract.

114.    That the contract between Plaintiff and ██████ terminated on October 1, 2021, and the restrictive period did not expire until October 1, 2023.

115.    That ██████ breached the aforesaid contract by practicing pain management medicine within 20 miles of Cornwall, New York.

116.    That knowledge of the aforesaid restrictive covenant was obtained by Defendants by means of the facts and circumstances alleged above, direct communications from Plaintiff and through the Cease and Desist Letter sent to them by Plaintiff's Counsel, or otherwise.  A copy of the Cease and Desist letter, dated April 29, 2021, is annexed and made a part hereof as **Exhibit D**.

117.    That Defendants intentionally procured ██████ breach of the aforesaid restrictive covenant without justification.

118.    That as a result of the Defendants' interference with the aforesaid contract between Plaintiff and ██████, Plaintiff has been damaged as follows: loss of revenue generated by ██████; loss of economic advantage; loss of business relationships; attorneys' fees incurred in the enforcement of the aforesaid restrictive covenant; disruption of the Plaintiff's group practice; and Plaintiff has otherwise been damaged in a sum which cannot presently be determined, but which is at least Three Million Dollars ($3,000,000.00).

## COUNT V

### Misappropriation of Trade Secrets
### (All Defendants)

119.    Plaintiff repeats, realleges, and reiterates the allegations contained in all of the preceding paragraphs as if fully set forth herein.

120.     Pursuant to the Confidentiality and Nondisclosure Agreement, Plaintiff disclosed confidential financial information to the Defendants, including, without limitation, salary information and hourly payment information, and information pertaining to costs and utilization.

121.     Under the Confidentiality and Nondisclosure Agreement, the Defendant's use of the information provided to Defendant by Plaintiff was limited to specific purposes, which involved business endeavors to be engaged in between the Plaintiff and the Defendant.

122.     Instead of appropriately limiting the use of the confidential information obtained to items covered by the Purpose, such as the revenue sharing arrangement entered into between the Plaintiff and Defendant SLCH; Defendants used the confidential information they received from Plaintiff to perform sophisticated financial analyses weaponized to support the termination of Plaintiff's PSA with Defendant SLCH, and for use in both negotiations with MHA's competitor, Envision, and Defendant SLCH's pursuit of a business arrangement with FPG.

123.     This misuse of confidential information, which constituted trade secrets of MHA, was done without the express or implied consent of MHA.

124.     The confidential information constituted trade secrets because: (1) it was not known outside of Plaintiff; (2) it was not known by Plaintiff's employees, other than those in positions of control within the Plaintiff; (3) Plaintiff took extensive measures to guard the secrecy of the information; (4) the information had great value to Plaintiff and its competitors; (5) great effort and monetary funds were expended by the Plaintiff in developing the information; and (6) it would have been extremely difficult for the information to be properly acquired or duplicated by others.

125.    That as a result of the Defendants' actions, Plaintiff has been damaged as follows: loss of revenue from its physicians and staff; loss of economic advantage; loss of business relationships; attorneys' fees incurred in the enforcement of the aforesaid restrictive covenant and otherwise; disruption of the Plaintiff's group practice; and Plaintiff has otherwise been damaged in a sum which cannot be presently determined, but which is at least seven million dollars ($7,000,000.00).

126.    That Plaintiff, based on the willful, malicious, and wanton acts of the Defendant is entitled to punitive damages of ten million dollars ($10,000,000.00) for total damages under Count V of seventeen million dollars ($17,000,000.00).

## COUNT VI

### Violation of Defend Trade Secrets Act: 18 U.S.C. § 1831 et seq.
### (All Defendants)

127.    Plaintiff repeats, realleges, and reiterates the allegations contained in all of the preceding paragraphs as if fully set forth herein.

128.    Pursuant to the Confidentiality and Nondisclosure Agreement, Plaintiff disclosed confidential financial information to the Defendants, including, without limitation, salary information and hourly payment information, and information pertaining to costs and utilization.

129.    Under the Confidentiality and Nondisclosure Agreement, the information was limited to specific purposes, which involved business endeavors to be engaged in between the Plaintiff and the Defendant.

130.    Instead of appropriately limiting the use of the confidential information obtained to items covered by the Purpose, such as the revenue sharing arrangement entered into between the Plaintiff and Defendant SLCH; Defendants used the

confidential information they received from Plaintiff to perform sophisticated financial analyses weaponized to support the termination of Plaintiff's PSA with Defendant SLCH, and for use in both negotiations with MHA's competitor, Envision, and Defendant SLCH's pursuit of a business arrangement with FPG.

131.     This misuse of confidential information, which constituted trade secrets of MHA, was done without the express or implied consent of MHA.

132.     The confidential information constituted trade secrets because: (1) it was not known outside of Plaintiff; (2) it was not known by Plaintiff's employees other than those in positions of control within the Plaintiff; (3) Plaintiff took extensive measures to guard the secrecy of the information; (4) the information had great value to Plaintiff and its competitors; (5) great effort and monetary funds were expended by the Plaintiff in developing the information; and (6) it would have been extremely difficult for the information to be properly acquired or duplicated by others.

133.     That as a result of the Defendants' violation of the Defend Trade Secrets Act, Plaintiff has been damaged as follows: loss of revenue from its physicians and staff; loss of economic advantage; loss of business relationships; attorneys' fees incurred in the enforcement of the aforesaid restrictive covenant and otherwise; disruption of the Plaintiff's group practice; and Plaintiff has otherwise been damaged in a sum which cannot be presently determined, but which is at least seven million dollars ($7,000,000.00).

134.     That Plaintiff, based on the willful, malicious, and wanton acts of the Defendant is entitled to exemplary damages of fourteen million dollars ($14,000,000.00) for total damages under Count VI of twenty-one million dollars ($21,000,000.00).

WHEREFORE, Plaintiff demands as judgment against the Defendants as follows:

1.      On the first cause of action for money damages in the sum of at least $7,000,000.00.

2.      On the second cause of action for money damages in the sum of at least $7,000,000.00.

3.      On the third cause of action for money damages in the sum of at least $7,000,000.00 and $5,000,000.00 of punitive damages, in a cumulative sum of at least $12,000,000.00.

4.      On the fourth cause of action for money damages in the sum of at least $3,000,000.00.

5.      On the fifth cause of action for money damages in the sum of at least $7,000,000.00 and $10,000,00.00 in punitive damages, in a cumulative sum in the amount of at least $17,000,000.00.

6.      On the sixth cause of action for money damages in the sum of at least $7,000,000.00 and $14,000,00.00 in exemplary damages, in a cumulative sum in the amount of at least $21,000,000.00.

7.      Together with interest, attorneys' fees, sanctions, the costs and disbursements of

this action; and for such other and further relief as the Court may deem just and proper.

Dated: June 20, 2024

Emma C. Carlson, Esq.
SDNY #EC2222
Daniels, Porco & Lusardi, LLP
1 Memorial Avenue
Pawling, New York 12564
Tel. No. (845) 855-5900
Email: ECC@dpllawyers.com

**JURY TRIAL DEMAND**

Plaintiff demands a jury trial on all matters set forth in this Complaint.