USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___3/16/2026___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MID-HUDSON  ANESTHESIOLOGISTS, P.C.,

                              Plaintiff,

-against-

ST.   LUKE'S   CORNWALL   n/k/a
MONTEFIORE ST. LUKE'S CORNWALL,
MONTEFIORE  HEALTH  SYSTEM,  INC.,
and MONTEFIORE MEDICAL CENTER,

                              Defendants.

24 CV 4740 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiff Mid-Hudson Anesthesiologists, P.C. ("Mid-Hudson" or "Plaintiff") commenced

this action on June 21, 2024, asserting claims for breach of the Anesthesia Services Agreement

("ASA"), breach of a confidentiality and nondisclosure agreement, breach of the implied covenant

of good faith and fair dealing, tortious interference with contract, and trade secret misappropriation

under federal and state law against Defendant St. Luke's Cornwall Hospital n/k/a Montefiore St.

Luke's Cornwall ("St. Luke's"), Montefiore Medical Center ("MMC"), and Montefiore Health

System, Inc. ("Montefiore").

Defendants move to dismiss Plaintiff's First Amended Complaint ("FAC") pursuant to

Federal Rule of Civil Procedure 12(b)(6). (*See generally* FAC, ECF No. 30.) For the reasons set

forth below, the motion is GRANTED IN PART and DENIED IN PART.

1

## BACKGROUND

### A. FACTUAL BACKGROUND

The facts below are drawn from the FAC and accepted as true for purposes of this motion.

Plaintiff Mid-Hudson is a New York professional corporation established in 1975. (FAC ¶ 1.) For approximately forty-six years, Mid-Hudson served as the exclusive provider of anesthesia services to St. Luke's. (*Id*. ¶ 13.) Mid-Hudson's practice consisted of physician anesthesiologists and certified registered nurse anesthetists ("CRNAs") who collectively provided anesthesia coverage for St. Luke's surgical operations. (*Id*. ¶¶ 37–40.) St. Luke's and MMC are not-for-profit hospital corporations organized under New York law. (*Id*. ¶¶ 2, 6.) Montefiore operated in furtherance and support of St. Luke's and exercised common supervision and control over it. (Id. ¶¶ 3–5.)

On August 27, 2003, Mid-Hudson and St. Luke's entered into an Anesthesia Services Agreement ("ASA"), which was amended several times and remained in effect through September 30, 2021. (FAC ¶¶ 29, 35.) Under the ASA, Mid-Hudson served as the exclusive provider of anesthesia services to St. Luke's and to the East Orange Ambulatory Surgery Center, in which St. Luke's held an ownership interest. (*Id.* ¶ 30.) Mid-Hudson was restricted from providing anesthesia services elsewhere. (*Id.* ¶ 31.) Section 6.2 of the ASA required the parties to use "best efforts" to negotiate renewal during a ninety-day periodic review period preceding expiration. (*Id.* ¶¶ 14, 34.) The final Review Period was to begin on July 2, 2021. (*Id.* ¶ 36.)

The ASA required St. Luke's to conduct annual performance evaluations, identify deficiencies, and provide Mid-Hudson an opportunity to cure. (FAC ¶¶ 45–49.) These provisions were reinforced in amendments in 2009 and 2015. (*Id.* ¶¶ 46–47.) In October 2020, the ASA was further amended to require monthly performance review meetings. (*Id.* ¶ 51.) The parties met

monthly from November 2020 through the end of the ASA term, and no performance or quality deficiencies were identified. (*Id.* ¶¶ 52–55.) St. Luke's did not provide annual performance evaluations in 2020 or 2021 and did not notify Mid-Hudson of any default. (*Id.* ¶¶ 48–50, 56.)

Throughout the relevant period, Mid-Hudson met the staffing requirements specified in the ASA, employing eight to nine anesthesiologists and thirteen CRNAs, and providing six anesthesiologists and nine CRNAs on a full-time equivalent basis to St. Luke's. (FAC ¶¶ 37–42.) During non-pandemic years, Mid-Hudson billed patients and insurers directly and did not require a financial subsidy from St. Luke's. (*Id.* ¶¶ 71–73.) In 2019, the practice generated approximately $6.8 million in revenue. (*Id*. ¶ 70.)

On February 19, 2020, Mid-Hudson and St. Luke's entered into a Confidentiality and Nondisclosure Agreement ("Confidentiality Agreement"), which limited the use of non-public information to defined business purposes between the parties. (FAC ¶¶ 74–80.) Following execution of that Agreement, St. Luke's requested and received financial and operational information from Mid-Hudson, including salary data, billing information, Relative Value Units, and procedure-linked ASA unit data. (*Id.* ¶¶ 90–96.) Linking procedure codes to ASA billing units required electronic data maintained by Mid-Hudson. (*Id.* ¶¶ 99–107.) Reconstructing that information from paper charts would have required review of approximately 10,000 charts annually at 30 to 45 minutes per chart—approximately 5,000 hours of labor. (*Id.* ¶¶ 102–106.) Mid-Hudson provided the requested information pursuant to the Confidentiality Agreement. (*Id.* ¶ 108.) This information was proprietary and maintained in password-protected electronic systems accessible only to authorized personnel. (*Id*. ¶¶ 97–101.) Notably, Section 7 of the Confidentiality Agreement contained a non-solicitation provision. (*Id.* ¶ 156.)

3

Beginning in 2018 or 2019, St. Luke's leadership, including Chief Medical Officer ("CMO") Gina Del Savio, contemplated eliminating St. Luke's relationship with Mid-Hudson and bringing anesthesia services in-house. (FAC ¶¶ 87–88.) In 2019, St. Luke's reached out to Mid-Hudson's competitor, Envision. (*Id.* ¶ 89.) In the fall of 2020, at least eight months before the Review Period was scheduled to begin, St. Luke's engaged in negotiations with Envision without notifying Mid-Hudson. (*Id.* ¶¶ 15, 57–59.)

On November 25, 2020, after obtaining Mid-Hudson's confidential financial data, CMO Del Savio emailed St. Luke's Chief Executive Officer ("CEO") advocating that St. Luke's sever its relationship with Mid-Hudson and pursue an employed physician model. (*Id.* ¶¶ 114–115.) The decision to replace Mid-Hudson was made before the Review Period and without consultation with the Medical Executive Committee as required by St. Luke's Medical Staff Bylaws. (*Id.* ¶¶ 60–63.) Although the decision to transition to Envision was made prior to November 2020, the Board of Trustees was not advised of that decision until June 30, 2021. (*Id.* ¶ 64.) The CEO represented to the Board that the decision was informed by analysis from Surgical Directions, even though Surgical Directions' work occurred in 2021 after the decision to transition had already been made. (*Id.* ¶¶ 65–66, 69.)

On June 14, 2021, Mid-Hudson's physician leadership was summoned and informed that they must join Envision as individual employees or face expiration of the ASA without renewal. (FAC ¶ 123.) Between June 14 and June 28, 2021, St. Luke's abandoned the nearly consummated Envision transaction and, with guidance from MMC, pursued an in-house anesthesia model. (*Id.* ¶¶ 124–125.) Plaintiff contends that MMC was involved in evaluating and implementing the in-house anesthesia model as part of a broader system-wide strategy. (*Id.* ¶¶ 130, 188.) Internal communications reflected that the financial viability of the in-house model depended upon

recruiting a substantial majority of Mid-Hudson's physicians, with projections premised on securing approximately two-thirds of the group. (*Id.* ¶¶ 130–134.)

In early July 2021, St. Luke's evaluated the "loyalty" of Mid-Hudson's physicians and began directly contacting them with employment offers. (FAC ¶¶ 160–162.) On July 8, 2021, Mid-Hudson sent a cease-and-desist letter notifying St. Luke's that its physicians were subject to restrictive covenants. (*Id.* ¶ 165.) Direct solicitation efforts continued thereafter. (*Id.* ¶¶ 167–170.) Only one physician ultimately accepted employment with St. Luke's. (*Id.* ¶ 176.) Other physicians, concerned about non-renewal of the ASA and uncertainty regarding the practice's viability, sought alternative employment. (*Id.* ¶¶ 175–177.) Mid-Hudson's physicians were contractually restricted from practicing elsewhere during the term of the ASA. (*Id.* ¶ 200.)

Prior to these events, Mid-Hudson had potential business opportunities with Northwell Health and New York Presbyterian Hudson Valley Hospital. (FAC ¶¶ 138–144, 145–149.) Those opportunities were not consummated following the loss of physician personnel. (*Id.* ¶¶ 144, 149.) Mid-Hudson possessed accumulated partner equity valued at over $5 million, derived from decades of exclusive service relationships. (*Id.* ¶¶ 178–183.) Following termination of the ASA and the loss of its physician workforce, Mid-Hudson ceased operations, eliminating the value of the partners' accumulated equity. (*Id.* ¶¶ 178–183.)

Based on these allegations, Plaintiff asserts claims for breach of the Anesthesia Services Agreement (Count I), breach of the Confidentiality and Nondisclosure Agreement (Count II), breach of the covenant of good faith and fair dealing (Count III), inducing breach of contract (Count IV), misappropriation of trade secrets (Count V), and violation of the Defend Trade Secrets Act ("DTSA") 18 U.S.C. § 1836 (Count VI). (FAC ¶¶ 190-237.)

5

**PROCEDURAL HISTORY**

Plaintiff filed this action on June 21, 2024, and filed the FAC on January 10, 2025, which is the operative pleading. (ECF Nos. 1, 27.) On April 10, 2025, Defendants moved to dismiss the FAC and filed a supporting memorandum of law. (Dfts. Mot. & Mem., ECF Nos. 30 & 31.) Plaintiff filed its opposition, and Defendants thereafter submitted their reply. (Pltf. Opp., ECF No. 35; Dfts. Reply, ECF No. 37.)

**LEGAL STANDARD**

**A. Rule 12(b)(6)**

Under Federal Rule of Civil Procedure 12(b)(6), dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. While the Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). The Second Circuit "deem[s] a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference . . . and documents that plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (internal citations omitted). The critical inquiry is whether the Plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. A motion to dismiss will be denied where

6

the allegations "allow [] the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## DISCUSSION

Defendants move pursuant to Rule 12(b)(6) to dismiss each count of the FAC. The Court addresses in turn: (1) Count I for breach of the Anesthesia Services Agreement ("ASA"); (2) Count II for breach of the Confidentiality Agreement; (3) Count III for breach of the implied covenant of good faith and fair dealing; (4) Count IV for inducing breach of contract; and (5) Counts V and VI for misappropriation of trade secrets under the DTSA and New York law. (FAC ¶¶ 190-237.)

### A.  Montefiore Health System, Inc.

All claims against Defendant Montefiore are dismissed. To state a claim against a particular defendant, a complaint must contain non-conclusory factual allegations describing that defendant's conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A pleading that merely lumps all defendants together without distinguishing their actions fails to provide adequate notice and cannot survive a motion to dismiss. *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001); *Medina v. Bauer*, No. 02 Civ. 8837 (DC), 2004 WL 136636, at *6 (S.D.N.Y. Jan. 27, 2004).

Here, the FAC contains no specific factual allegations describing conduct by Montefiore. Instead, Plaintiff alleges only in general terms that Montefiore acted as a parent entity that "controlled" St. Luke's and its major decisions. (FAC ¶ 5.) Such conclusory assertions of corporate control—without factual allegations describing what Montefiore itself did, who acted on its behalf, or how it participated in the challenged conduct—are insufficient to state a plausible claim for relief. *DeJesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69-70 (2d Cir. 1996).

In opposition, Plaintiff points to a tax form identifying Montefiore in connection with St. Luke's and contends that the document demonstrates Montefiore involvement in the relevant

events. (FAC ¶ 4.) That argument does not cure the pleading deficiency. At most, the tax document reflects a corporate relationship between entities; it does not sufficiently allege that Montefiore itself participated in the alleged contract breaches, negotiations, or trade secret misappropriation at issue in this case. (*See* Dfts. Mem. at 27-28.) A parent corporation's corporate affiliation with a subsidiary, standing alone, is generally insufficient to establish liability absent allegations of the parent's direct participation in the challenged conduct. *DeJesus,* 87 F.3d at 69.

Because Plaintiff fails to allege defendant-specific conduct attributable to Montefiore, the claims against Montefiore cannot proceed. Accordingly, the motion to dismiss is GRANTED as to Montefiore, and all claims against that defendant are dismissed without prejudice. The Court therefore limits the remainder of its analysis to the defendants as to whom Plaintiff pleads specific conduct— St. Luke's and MMC.

### B. Count I: Breach of the Anesthesia Services Agreement

Plaintiff states a viable claim for breach of the ASA.  Under New York law, a plaintiff asserting breach of contract must allege "1) the existence of an enforceable contract, (2) the plaintiff's performance pursuant to that contract, (3) the defendant's breach of the contract, and (4) damages resulting from that breach." *Nassau Operating Co., LLC v. DeSimone*, 206 A.D.3d 920, 926 (2022). At the pleading stage, the Court accepts the FAC's factual allegations as true and draws reasonable inferences in the plaintiff's favor. *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011).

The existence of the ASA is not disputed. (FAC ¶ 14.) The parties' dispute centers on Section 6.2 of the agreement, which required the parties, during the ninety-day pre-expiration review period, to use their "best efforts" to meet and renegotiate the contractual terms. (*Id*. ¶¶ 119, 187.) New York law treats a best-efforts clause as requiring genuine diligence and reasonable

efforts toward achieving the contract's stated objective. *Robin Bay Assocs., LLC v. Merrill Lynch & Co.,* No. 07 CIV. 376 (JMB), 2008 WL 2275902, at *7 (S.D.N.Y. June 3, 2008) ("Best efforts' requires that plaintiffs pursue all reasonable methods…"); *Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 470 (S.D.N.Y. 2018), *aff'd*, 769 F. App'x 40 (2d Cir. 2019). Whether a party satisfied that obligation depends on the surrounding circumstances and ordinarily presents a fact-intensive inquiry not resolved on the pleadings. *Robin Bay Assocs.*, 2008 WL 2275902, at *7 (quoting *U.S. Airways Group, Inc. v. British Airways PLC,* 989 F. Supp. 482, 491 (S.D.N.Y.1997); *Maestro W. Chelsea SPE LLC v. Pradera Realty Inc.,* 38 Misc. 3d 522, 530 (Sup. Ct. 2012) ("the precise meaning of a best efforts provision and whether the provision is breached are factual issues that cannot be resolved on the face of the complaint.")

Mid-Hudson performed its obligations under the ASA. Mid-Hudson continued to provide anesthesiology services at St. Luke's throughout the relevant period and complied with the staffing and operational requirements imposed by the agreement. (FAC ¶¶ 37–41.) Specifically, Mid-Hudson maintained the anesthesiologist and CRNA staffing levels necessary to support the hospital's surgical operations and ensured continuous anesthesia coverage consistent with the ASA's requirements. (*Id*.) Mid-Hudson also participated in the performance review process contemplated by the agreement, including attending regular meetings with hospital leadership to review operational and clinical matters. (*Id*. ¶¶ 52–53.) Notably, during the life of the agreement St. Luke's did not issue a notice of default, identify performance deficiencies, or invoke any contractual cure provisions. (*Id.* ¶¶ 48–56.) These allegations support a reasonable inference that Mid-Hudson satisfied its contractual obligations under the ASA during the relevant period. *R.H. Damon & Co., Inc. v. Softkey Software Prods., Inc.,* 811 F. Supp. 986, 991 (S.D.N.Y.1993)

(determining that a breach of contract claim "must contain *some* allegation that plaintiffs actually performed their obligations under the contract.")

Plaintiff has adequately pleaded breach of the ASA's best-efforts provision. Mid-Hudson asserts that St. Luke's determined well before the contractual review period that it would not renew the agreement, engaged in discussions with a competing anesthesia provider months before the review period began, and declined to meaningfully participate in renewal negotiations during the review process itself. (FAC ¶¶ 15–21, 119.) These allegations, if true, could support an inference that Defendants did not undertake genuine efforts to renegotiate the agreement as required by Section 6.2. Defendants offer a different account. Relying on a series of email communications, they contend that Mid-Hudson itself abandoned negotiations and therefore cannot claim a failure of best efforts. (*See* Widowski Decl. Exs. 3–10, ECF Nos. 33-3–33-10.) These competing interpretations cannot be resolved on a motion to dismiss. *See USAirways Group,* 989 F. Supp. at 491. Even assuming the Court may consider the referenced communications as integral to the FAC, they do not conclusively establish that Mid-Hudson abandoned negotiations or that Defendants satisfied their obligation to employ best efforts to renegotiate the agreement.

Finally, Plaintiff adequately pleads resulting damages. Plaintiff claims that Defendants' conduct caused the loss of revenue, disruption of its anesthesiology practice, loss of business relationships and economic opportunities, and the elimination of the practice's accumulated equity value—amounting to at least seven million dollars. (FAC ¶ 189.) According to the FAC, these losses flowed from Defendants' alleged failure to negotiate renewal of the ASA in good faith and their efforts to replace Mid-Hudson as the hospital's anesthesia provider. (*Id*. ¶¶ 174–189.) Under New York law, lost profits are recoverable where they were within the contemplation of the parties at the time of contracting and capable of proof with reasonable certainty. *See Ashland Mgmt. Inc.*

*v. Janien*, 82 N.Y.2d 395, 403 (1993). At this stage, however, a plaintiff "need not plead the precise measure of damages"; "the complaint need only allege facts from which damages may reasonably be inferred." *Fed. Hous. Fin. Agency for Fed. Home Loan Mortg. Corp. v. Morgan Stanley ABS Cap. I Inc.,* 59 Misc. 3d 754, 784(N.Y. Sup. Ct. 2018); *see also Process America, Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016) (damages need only rest on a "stable foundation for a reasonable estimate"). Here, the alleged losses arise from the termination of a long-standing exclusive anesthesia services arrangement, making it reasonably foreseeable that Mid-Hudson would suffer lost revenue and related business losses if the agreement were not renewed. In light of the foregoing, the damages element is satisfied.

Count I therefore survives dismissal.

### C.  Count II: Breach of the Confidentiality and Non-Disclosure Agreement

Plaintiff also states a plausible claim for breach of the Confidentiality Agreement. As with the ASA claim discussed above, Plaintiff must plausibly allege the existence of a contract, its own performance, a breach by Defendants, and resulting damages. *Nassau,* 206 A.D.3d at 926. When the plain language of a contract clearly expresses the parties' intent, interpretation presents a question of law for the Court. *See Crane Co. v. Coltec Indus., Inc*., 171 F.3d 733, 737 (2d Cir. 1999). By contrast, where contractual language is ambiguous, dismissal at the motion to dismiss stage is generally inappropriate because resolving that ambiguity requires consideration of factual context. *See Bank of New York, N.A. v. Franklin Advisors, Inc*., 522 F. Supp. 2d 632, 637 (S.D.N.Y. 2007). Under New York law, a contract is considered ambiguous if its terms are reasonably susceptible to more than one interpretation when viewed objectively in light of the agreement as a whole and the relevant commercial context. *See Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., N.A*., 773 F.3d 110, 114 (2d Cir. 2014).

There is no dispute that Mid-Hudson and St. Luke's executed a Confidentiality and Nondisclosure Agreement governing the exchange and use of non-public information. (FAC ¶ 74.) The agreement was entered into while the parties were discussing the continuation of their anesthesia services relationship and the possibility of future arrangements involving Mid-Hudson's services. (*Id*. ¶¶ 74–79.) Plaintiff also adequately pleads its own performance under that Agreement. Mid-Hudson provided confidential financial and operational information—including salary data, billing information, utilization metrics, and procedure-linked ASA unit data—in response to requests from St. Luke's during discussions about the parties' working relationship (*Id*. ¶¶ 21–22, 81–83.) The information was not publicly available, was accessible only to authorized Mid-Hudson personnel, and was disclosed under the Confidentiality Agreement for the limited purpose of evaluating the parties' business relationship. (*Id*. ¶¶ 84, 231-233.) Accepting these allegations as true, the pleadings adequately support the inference that Mid-Hudson complied with its obligations under the Agreement and disclosed the requested information in reliance on the Agreement's confidentiality protections.

The central question is whether Defendants' subsequent use of Mid-Hudson's confidential information exceeded the scope permitted under Section 2 of the Agreement. (FAC ¶ 193.) This provision limited the use of non-public information to discussions that might lead to a "business engagement, transaction, or other definitive relationship between the Parties and/or affiliated persons." (Pltf. Opp. 12–13.) Plaintiff claims that St. Luke's, in violation of the Agreement's provision, obtained Mid-Hudson's proprietary financial and operational information to develop an in-house anesthesia model designed to replace Mid-Hudson and shared the information within the Montefiore system, including with MMC. (*Id*. at 13–14.)

12

Defendants counter that the Agreement's reference to "affiliated persons" permitted such conduct, including sharing the information with MMC and using it to evaluate alternative anesthesia service arrangements. (Dfts. Reply at 1–3.) At this juncture, however, Defendants' interpretation does not resolve the dispute. Courts must interpret contracts in a manner that gives effect to all provisions and avoids rendering limiting language superfluous. *MassMutual Asset Fin. LLC v. ACBL River Operations, LLC*, 220 F. Supp. 3d 450, 454 (S.D.N.Y. 2016) (quoting *Chesapeake Energy,* 773 F.3d at 114). Even if the Agreement contemplated potential dealings involving affiliated entities, it does not necessarily follow that Defendants were authorized to use Mid-Hudson's confidential information to design an alternative operating structure that would displace Mid-Hudson entirely. Therefore, the parties' competing interpretations of whether St. Luke's use of the information remained within the Agreement's defined purpose present a factual dispute not appropriate for resolution on a motion to dismiss. *See MassMutual,* 220 F. Supp. 3d at 454 ("Where a contract is ambiguous, a fact issue exists precluding dismissal under Rule 12(b)(6).").

The pleadings also support a plausible inference that Defendants breached the Agreement's non-solicitation provision. (FAC ¶ 193.) That provision prohibited Defendants from hiring or inducing Mid-Hudson's employees during the contractual term and for 365 days thereafter. (*Id.* ¶ 156.) The pleadings indicate that Defendants nonetheless contacted physicians affiliated with Mid-Hudson in an effort to recruit them to staff the proposed in-house anesthesia model. (*Id*. ¶¶ 160–162, 170, 190–195.) These communications allegedly occurred during the final months of the ASA's term while Defendants were planning a transition away from Mid-Hudson. (*Id*. ¶¶ 160–162.) Accepting these allegations as true, the pleadings plausibly implicate the Agreement's non-solicitation restriction. Whether the communications constituted permissible employment

discussions or instead amounted to prohibited solicitation presents a factual question inappropriate for resolution on a motion to dismiss. *See MassMutual,* 220 F. Supp. 3d at 454

Lastly, Plaintiff plausibly alleges damages resulting from Defendants' alleged misuse of confidential information and recruitment of Plaintiff's physicians. The FAC states that this conduct caused lost revenue, disruption to Plaintiff's anesthesiology practice, harm to business relationships and economic opportunities, and the destruction of the practice's accumulated equity value. (FAC ¶¶ 175, 195.) Those allegations are sufficient at this stage. *See Ashland Mgmt.*, 82 N.Y.2d at 403; *Fed. Hous. Fin. Agency*, 59 Misc. 3d at 784. As discussed with respect to Count I, Plaintiff need not plead damages with precision on a motion to dismiss; it is enough that the FAC alleges facts from which damages may reasonably be inferred.

Count II therefore survives dismissal.

### D.  Count III: Breach of the Implied Covenant of Good Faith and Fair Dealing

Count III must be dismissed because it is duplicative of Plaintiff's express breach-of-contract claim. Under New York law, every contract contains an implied covenant of good faith and fair dealing, which requires that neither party act in a manner that would deprive the other of the fruits of the agreement. *Wymara, Ltd. v. Gansevoort Hotel Grp., LLC,* 241 A.D.3d 1611, 1613 (2025); *Hadami, S.A. v. Xerox Corp.,* 272 F. Supp. 3d 587, 598 (S.D.N.Y. 2017). However, an implied covenant claim cannot be maintained where it is based on the same facts and seeks the same damages as an express breach of contract claim. *See Hadami,* 272 F. Supp. 3d at 598 ("When a plaintiff claims a breach of the implied covenant of good faith and fair dealing based on the same facts as a breach of contract claim, the claim for the breach of the implied covenant must be dismissed as duplicative of the breach of contract claim."); *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002) (same); *MBIA Ins. Corp. v. Countrywide Home Loans,*

*Inc.,* 87 A.D.3d 287, 297 (1st Dep't 2011) (same); *Refreshment Mgmt. Servs., Corp. v. Complete Off. Supply Warehouse Corp.,* 89 A.D.3d 913, 915 (2011) (same). The covenant cannot be used to impose obligations that are inconsistent with the terms of the contractual relationship, nor may it be invoked to duplicate a claim for breach of an express contractual provision. *Wymara,* 241 A.D.3d at 1613; *Refreshment Mgmt. Servs.,* 89 A.D.3d at 915; *Harris,* 310 F.3d at 81.

Here, Plaintiff's implied covenant claim rests on the same core allegations underlying Count I. Defendants predetermined not to renew the ASA, engaged in discussions with alternative providers prior to the contractual review period, and failed to meaningfully negotiate during the ninety-day renewal process. (FAC ¶¶ 15–21, 119.) Those same allegations form the basis of Plaintiff's express breach claim, which asserts that Defendants violated Section 6.2 of the ASA by failing to employ "best efforts" to renegotiate the agreement. (*Id*. ¶¶ 119, 187.) The implied covenant claim does not identify any contractual gap or discretionary authority separate from the conduct addressed by the ASA's express best-efforts provision. Instead, it simply reframes the alleged failure to negotiate in good faith as an independent breach of the implied covenant. New York courts routinely dismiss such claims where the alleged misconduct is governed by an express contractual term and the implied covenant claim relies on the same factual predicate. *See Wymara,* 241 A.D.3d at 1613; *MBIA*, 87 A.D.3d 287, at 297.

Moreover, the damages alleged under Count III largely mirror those sought for the alleged breach of the ASA—namely, the loss of the contractual relationship, the physician workforce, business relationships, and related economic harm following the expiration of the agreement, totaling approximately seven million dollars. (Compare FAC ¶ 189 with ¶ 203); *see also Refreshment Mgmt. Servs.,* 89 A.D.3d at 915. Because the implied covenant claim neither relies on distinct facts nor seeks different damages from the express breach claim, it does not state an

15

independent cause of action. Count III is therefore dismissed with prejudice as duplicative of Plaintiff's breach of contract claim.

### E. Count IV: Tortious Inference with Contract ("Inducing Breach")

Construed as a claim for tortious interference with contract, Count IV is adequately pleaded. It concerns two restrictive covenants: a non-solicitation provision contained in the parties' Confidentiality Agreement and a non-compete provision contained in Plaintiff's employment agreement with Dr. Hosain. (FAC ¶¶ 21, 206.) Although Plaintiff styles this claim as one for "inducing breach," New York law treats such allegations as a claim for tortious interference with contract. *See Meghan Beard, Inc. v. Fadina*, 82 A.D.3d 591, 592 (1st Dep't 2011). To state such a claim, a plaintiff must adequately allege "(1) the existence of a valid contract; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procurement of the breach of that contract; and (4) damages." *Israel v. Wood Dolson Co.*, 1 N.Y.2d 116, 120 (1956).

Plaintiff adequately pleads the first two elements. Mid-Hudson maintained written employment agreements with its physicians that contained restrictive covenants limiting their ability to practice elsewhere during the term of their employment. (FAC ¶ 206.) These agreements constitute valid contracts between Plaintiff and third parties. Defendants were also aware of those agreements. They were notified that Mid-Hudson's physicians were bound by restrictive covenants, and Plaintiff sent a cease-and-desist letter advising Defendants of those obligations once recruitment efforts began. (*Id*. ¶ 210.)

The FAC also supports a plausible inference of intentional procurement. Direct recruitment of employees subject to restrictive covenants may constitute intentional procurement where the defendant is aware of the contractual restrictions governing those employees. *OTG Mgmt., LLC v. Konstantinidis*, 40 Misc. 3d 617, 622 (Sup. Ct. 2013) ("defendant may not solicit or recruit any

16

individual while they are employed by said plaintiff."). Here, Defendants contacted Mid-Hudson physicians and attempted to recruit them to join an in-house anesthesia model intended to replace Mid-Hudson as the hospital's anesthesia provider. (FAC ¶¶ 18, 21, 24, 170.) These recruitment efforts allegedly occurred while the physicians remained subject to restrictive covenants, and at least one physician ultimately left the practice as a result. (*Id.* ¶ 177.) Given Defendants' knowledge of those covenants, that knowledge, coupled with Defendants' recruitment efforts directed at physicians subject to those covenants, plausibly supports an inference that Defendants intentionally procured a breach. *See Rodrigues v. City of New York*, 193 A.D.2d 79, 88 (1st Dep't 1993) (permitting claim to survive motion to dismiss based on inference of intent considering Defendant's alleged motive and personal interest).

Defendants counter that Plaintiff's induced breach claim fails because the restrictive covenants underlying the alleged inducement are unenforceable as a matter of law. (Dfts. Mem. at 22–24.) Under New York law, restrictive covenants are enforceable only to the extent that they are reasonable in duration and scope, necessary to protect the employer's legitimate interests, do not impose undue hardship on the employee, and are not harmful to the public. *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 389 (1999). Defendants specifically contend that Plaintiff lacks a protectable interest because the physicians treated hospital patients rather than maintaining an independent client base and because anesthesiology services are not "unique or extraordinary." (Dfts. Mem. at 22–23.) However, those arguments cannot be resolved on the pleadings. Determining whether a restrictive covenant satisfies the *BDO Seidman* reasonableness standard ordinarily requires a fact-intensive inquiry into the covenant's scope, duration, geographic reach, and the employer's protectable interests. *Twitchell Tech. Products, LLC v. Mechoshade Sys., LLC*, 227 A.D.3d 45, 208 (2d Dept. 2024) (holding that it was premature to assess enforceability of a

restrictive covenant on the pleadings where the *BDO Seidman* reasonableness factors required factual development). The Court therefore declines to determine enforceability at this early phase of the litigation.

Defendants also contend that Plaintiff cannot rely on the restrictive covenants because related claims concerning those covenants were previously dismissed in a state court action. (Dfts. Mem. at 12, 22–24.) Specifically, Defendants argue that the dismissal of the breach-of-contract claim against Dr. Hosain precludes Plaintiff from relying on that agreement as the underlying contract for its inducing-breach claim. (*Id.* at 22-24.) However, the prior action did not result in a determination on the merits regarding the enforceability of the restrictive covenants. Rather, the inducing-breach claim was discontinued without prejudice pursuant to a stipulation of discontinuance, leaving the merits unresolved and therefore incapable of giving rise to claim or issue preclusion. *See Reyes v. Seaqua Delicatessen, Inc.*, 234 A.D.3d 88 (2d Dep't 2024).

Plaintiff also adequately alleges damages. Under New York law, damages for tortious interference with contract may include both the pecuniary loss of contractual benefits and consequential losses proximately caused by the interference. *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 197 n.6 (1980); *Rich v. Fox News Network, LLC*, 939 F.3d 112, 128 (2d Cir. 2019); *Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 597 (2d Cir. 1996); *Restatement (Second) of Torts* § 774A(1). Here, Plaintiff alleges that Defendants' recruitment efforts destabilized Mid-Hudson's physician workforce and caused lost revenue, lost economic opportunities, and disruption to Plaintiff's business operations, producing damages exceeding three million dollars. (FAC ¶ 212.) These allegations sufficiently plead both the loss of contractual benefits and consequential business losses at the pleading stage.

Plaintiff's allegations are sufficient to state a tortious interference claim for purposes of this motion.

### F. Counts V and VI: Misappropriation of Trade Secrets (New York Common Law and the Defend Trade Secrets Act)

The trade-secret claims are sufficiently pleaded under both New York law and the DTSA.

"The requirements for showing a misappropriation of a trade secret are similar under state and federal law." *Free Country Ltd. v. Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016). For a claim under the DTSA, Plaintiff must show that "(1) [it] possessed a trade secret, and (2) Defendants misappropriated that trade secret." 18 U.S.C. § 1836(b)(1); *Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 251 n.12 (S.D.N.Y. 2021). Similarly, under New York law, Plaintiff must demonstrate "(1) that [it] possessed a trade secret, and (2) that defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *Free Country*, 235 F. Supp. 3d at 565; *Town & Country,* 556 F. Supp. 3d at 251. Because the elements substantially overlap, courts routinely analyze the claims together. *See ExpertConnect, LLC v. Fowler*, 2019 WL 3004161, at *4 n.1 (S.D.N.Y. July 10, 2019).

A trade secret may consist of "any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it." *Ashland Mgmt.,* 82 N.Y.2d at 407. Courts consider several factors in determining whether information qualifies as a trade secret, including the extent to which the information is known outside the business, the measures taken to maintain its secrecy, its value to competitors, the effort expended in developing it, and the ease with which it could be acquired or duplicated by others. *Id.* Notably, whether information constitutes a trade secret is generally a question of fact not appropriate for resolution on a motion to dismiss. *LinkCo, Inc. v. Fujitsu Ltd.*, 2002 WL 237838, at *3 (S.D.N.Y. Feb 19, 2002); *see also Chevron U.S.A. v Roxen Servs.,* 813 F2d 26, 29 (2d Cir. 1987).

On these allegations, the information at issue plausibly satisfies those factors. Plaintiff asserts that Mid-Hudson developed a proprietary analytical framework integrating multiple

categories of operational and financial data—including procedure types, ASA billing units, salary structures, utilization metrics, and cost information—to evaluate procedure-level profitability and guide operational strategy. (FAC ¶¶ 221–236.) Mid-Hudson further alleges that it "developed this confidential information over the course of many years and expended great effort and monetary funds" to maintain it within encrypted, password-protected databases not accessible to the public. (Id. ¶¶ 228, 230.) Plaintiff also contends that its confidential billing data could only be "reverse engineered through laborious manual efforts, which were in practice impossible, and therefore, it could not be properly acquired [or duplicated] by others," including St. Luke's. (Id. ¶¶ 231–232.) Defendants obtained access to this information pursuant to the parties' Confidentiality Agreement during discussions concerning a potential continuation of their anesthesiology services relationship. (*Id*. ¶¶ 233–234.) These allegations are sufficient to support the existence of a protectable trade secret on a motion to dismiss because Mid-Hudson's information was developed through substantial effort, maintained in confidence, possessed competitive value, and was not readily obtainable by others. *See Ashland Mgmt.,* 82 N.Y.2d at 407.

Defendants counter that the alleged trade secrets consist merely of ordinary business data—such as salary figures or billing components—that cannot qualify as trade secrets. (Dfts. Mem. at 16.) That argument is unpersuasive at this juncture. Trade secret protection may extend to a proprietary compilation of information even where individual components are publicly available, so long as the integrated combination provides a competitive advantage not readily ascertainable by others. *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990); *see also Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 266, 276–77 (S.D.N.Y. 2021). Whether the information could be readily assembled through proper

means is a fact-intensive inquiry that cannot be resolved on a motion to dismiss. *See LinkCo,* 2002 WL 237838, at *3.

Misappropriation is also sufficiently pleaded. To state a claim for misappropriation of trade secrets under New York law, a complaint must plausibly allege "(1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *Schroeder v. Pinterest Inc.*, 17 N.Y.S.3d 678, 690 (1st Dep't 2015) (quoting *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir. 1999)). On a motion to dismiss, a plaintiff asserting trade secret misappropriation need only describe the alleged trade secret with sufficient specificity to place the defendant on notice of the nature of the claim. *See Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Group, Inc.*, 68 F.4th 792, 801 (2d Cir. 2023). Plaintiff satisfies that standard here.

Defendants later used Plaintiff's confidential financial modeling and operational analytics—information they had received in confidence from Plaintiff— "to perform sophisticated financial analyses weaponized to support the termination of Plaintiff's" services agreement with St. Luke's and for use in negotiations with Mid-Hudson's competitor, Envision. (FAC ¶¶ 233–236.) Accepting these allegations as true, the pleadings sufficiently support the inference that Defendants used Plaintiff's confidential information for purposes beyond those for which it was disclosed and in breach of the parties' confidentiality obligations. Such alleged misuse of confidential information obtained pursuant to a confidentiality agreement sufficiently pleads misappropriation under both New York law and the DTSA.

For purposes of this motion, Plaintiff's allegations support both the existence of a protectable trade secret and Defendants' alleged misappropriation. Defendants' motion to dismiss the trade secret claims is therefore denied.

21

## G.  Punitive Damages

Because Count III has been dismissed as duplicative of Plaintiff's breach-of-contract claim, the Court considers the request for punitive damages only in connection with Plaintiff's surviving trade-secret claims under New York law and the DTSA. (FAC ¶¶ 220, 237.) Punitive damages may be available in connection with intentional tortious conduct where the defendant's actions are sufficiently "gross and wanton." *See Marky's Martial Arts, Inc. v. FC Online Marketing, Inc.*, 2022 WL 18276016, at *8 (S.D.N.Y. 2022).  Because punitive damages are intended to punish the wrongdoer and deter similar misconduct, courts often decline to dismiss such requests at the pleading stage where the allegations plausibly suggest reckless or wanton conduct. *Topps Co. v. Cadbury Stani S.A.I.C., 380* F. Supp. 2d 250, 267 (S.D.N.Y. 2005).

Here, Plaintiff alleges that Defendants knowingly misused confidential financial, billing, and operational information obtained during the parties' business relationship in order to develop a strategy to replace Plaintiff as the hospital's anesthesia provider. (FAC ¶¶ 213–237.) Specifically, Defendants relied on Plaintiff's proprietary financial modeling, billing data, and operational analytics while simultaneously recruiting Plaintiff's physicians to join Defendants' in-house anesthesia model, thereby undermining the viability of Plaintiff's practice. (*Id.*) Accepting these allegations as true, Plaintiff plausibly alleges conduct that, if proven, could support an inference of reckless or wanton misconduct beyond an ordinary commercial dispute.   *See, e.g. Marky's Martial Arts,* 2022 WL 18276016, at *8 (S.D.N.Y. 2022) (holding punitive damages appropriate where defendant disclosed plaintiff's client list to competitors in violation of contractual confidentiality obligations).

Moreover, courts applying New York law have frequently declined to dismiss punitive damages demands at this stage. *See Jing Wang v. Tesla, Inc.*, No. 20-CV-3040, 2021 WL 3023088,

22

at *5 (E.D.N.Y. July 16, 2021) ("[T]he trend among courts applying New York law seems to be to deny attempts to dismiss prayers for punitive damages at the motion to dismiss stage because it is not even clear that there is a requirement that a complaint seeking punitive damages must plead specific facts that would support an award of such damages."); *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 318 n.5 (S.D.N.Y. 2010) (same). Thus, at this stage of the litigation, it would be premature to conclude that the allegations could not support a finding of reckless or wanton conduct. *See Premium Prods., Inc. v. O'Malley*, No. 2022-05116, 2026 WL 452303, at *4 (N.Y. App. Div. Feb. 18, 2026); *see also Gipe v. DBT Xpress, LLC*, 150 A.D.3d 1208, 1210 (2d Dep't 2017).

Whether Defendants' conduct ultimately rises to the level required to warrant punitive damages is a question better resolved on a more developed factual record. *See Premium Prods.,* 2026 WL 452303, at *4; *Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228, 267 (S.D.N.Y. 1999) (quoting *Nardelli v. Stamberg,* 44 N.Y.2d 500, 503 (1978)) ("[W]hether to award punitive damages and how much to award are 'primarily questions which reside in the sound discretion' " of the triers of fact);  *Loughry v. Lincoln First Bank,* 67 N.Y.2d 369, 378 (1986) ("the decision to award punitive damages in any particular case, as well as the amount, are generally matters within the sound discretion of the trier of fact.")

Defendants' motion to dismiss Plaintiff's request for punitive damages is therefore granted insofar as it relates to Count III and denied with respect to Counts V and VI.

### H.  Leave to Amend

"Although Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given when justice so requires,' it is within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d

23

Cir. 2007) (citations omitted). When exercising this discretion, courts consider many factors, including undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice to the opposing party, and futility. *Local 802, Associated Musicians of Greater N.Y. v. Parker Meridien Hotel*, 145 F.3d 85, 89 (2d Cir. 1998) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

The Court will grant Plaintiff leave to amend the claims dismissed without prejudice, as additional factual allegations may cure the deficiencies identified above. Although Plaintiff certainly faces significant hurdles to overcome, leave to amend in this case would not necessarily be futile at this juncture. Furthermore, as this case is still in its infancy, there would be minimal prejudice to Defendants in permitting Plaintiff to amend.

### CONCLUSION

For the foregoing reasons, Defendant St. Luke's Cornwall Hospital n/k/a Montefiore St. Luke's Cornwall, Montefiore Medical Center, and Montefiore Health System, Inc.'s motion to dismiss the FAC is GRANTED IN PART and DENIED IN PART.

The motion is GRANTED as to Defendant Montefiore and all claims against Montefiore are DISMISSED WITHOUT PREJUDICE. The motion is also GRANTED as to Count III (breach of the implied covenant of good faith and fair dealing), which is DISMISSED WITH PREJUDICE as duplicative. In all other respects, the motion is DENIED. Counts I, II, IV, V, and VI may proceed against St. Luke's and MMC, and Plaintiff's request for punitive damages remains only as to Counts V and VI.

Plaintiff is granted leave to file a Second Amended Complaint ("SAC") limited to the claims dismissed without prejudice on or before April 2, 2026. If Plaintiff fails to file a SAC by that date, those claims will be dismissed with prejudice. If Plaintiff timely files a SAC, Defendants

24

25

shall answer or otherwise respond within twenty-one (21) days of the filing. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 30.

Dated: March 16, 2026
White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge